[Civ. No. 1659.    Third Appellate District.—May 30, 1917.]

## F. P. MARSHALL, Respondent, v. RANSOME CONCRETE COMPANY, Defendant; SOUTHWESTERN SURETY INSURANCE CO. (a Corporation), Appellant.

WORKMEN'S COMPENSATION ACT — REDUCTION OF LIABILITY — SURGICAL OPERATION—INABILITY TO PROCURE.—An insurance carrier is not entitled to have an award of compensation made by the Industrial Accident Commission reduced or discontinued on the ground that the injured person refused or declined to undergo a surgical operation which would relieve the disability, in the absence of any showing that he had the means to alleviate his situation, or that the refusal was the result of his own negligence, and where it is shown that he had on two different occasions submitted to an operation with but little, if any, benefit.

ID.—INJURIES FROM NEGLIGENCE — MITIGATION — CARE REQUIRED.—One who has suffered personal injuries through the negligence or wrongful acts of another is bound to exercise reasonable care and diligence to avoid loss and to minimize the consequences of the injury, and he cannot recover for so much of his damage as results from his failure so to do, but he is not required to take the best care of his injuries, nor to employ the means best adapted to heal them, it being sufficient if he acts in good faith and with due diligence, and exercises ordinary care and reasonable or ordinary prudence.

APPEAL from a judgment of the Superior Court of Sacramento County.    Peter J. Shields, Judge.

The facts are stated in the opinion of the court.

George F. Hatton, Gus L. Baraty, and Hartley F. Peart, for Appellant.

Landreth & Patten, for Respondent.

Christopher M. Bradley, for Industrial Accident Commission.

BURNETT, J.—On the seventh day of March, 1913, at Sacramento, the applicant, F. P. Marshall, was seriously injured by the falling of a concrete tower.    He was an employee of the Ransome Concrete Company, and there is no dispute that he became subject to the provisions of the Workmen's

Compensation Act.    Appellant was the insurance carrier, and it paid him sixty-five per cent of his average weekly wages from the eighth day after the injury up to the eleventh day of September, 1914, when appellant concluded that the disability was not more than fifty per cent of total, and it paid compensation at the rate of $9.37 per week up to and including the ninth day of January, 1915, when further payments were discontinued.    On February 2, 1915, Marshall filed with the Industrial Accident Commission his application for adjustment of his claim for further compensation.    The claim was resisted on the grounds: 1. That the Industrial Accident Commission had no jurisdiction over a controversy arising out of an accident which occurred on March 17, 1913; and, 2. "That it would be possible by an operation to reduce the rate of disability to twenty-five per cent of total and inasmuch as applicant refuses to have such operation performed at his own expense, he is responsible for and willfully contributes to whatever disability now exists in excess of twenty-five per cent of total disability."

These objections were carefully considered by the Industrial Accident Commission, as shown by the evidence taken and by the opinion filed in the cause.    As to the question of jurisdiction, attention was called to the provision in the law of 1913 conferring upon the Industrial Accident Commission all the duties, liability, authority, powers, and privileges theretofore conferred upon the industrial accident board, and it may be said that there is no further contention as to this question.

As to the other point the commission declared: "The Roseberry act limits the medical and surgical service to cure and relieve to the sum of one hundred dollars, and for that reason this commission has no power to require medical or surgical treatment in excess of said one hundred dollars; but the act also nowhere confers upon the commission power to compel an injured employee to undergo an operation and to bear the cost and expense of medical or surgical treatment for the same, even for his own cure."    The commission furthermore proceeded to consider the extent of the liability of the insurance carrier in the premises, the amount already paid and the balance of the unpaid liability, and it concluded that the only method available for the insurance carrier to reduce its liability was to reduce the disability.    The commission, reiter-

ating its position that it is powerless to compel either party to follow the suggestion, earnestly recommended that the insurance carrier proffer the proposed operation to applicant at its own cost and that the applicant accept the offer. Finally it was said: "Before applicant submits to an operation, if tendered, this commission desires to have further surgical advice in relation to the feasibility of such operation." Two days thereafter the commission filed its findings of fact and made its award, directing the defendants, and each of them, to pay to F. P. Marshall, as a partial disability indemnity because of said injury, "the sum of nine dollars and thirty-seven cents per week for each and every week from and beginning with the tenth day of January, 1915, until the termination of said disability or the further order of this commission."

An application to the superior court of Sacramento County to review said award was made by the Insurance Company and therein said award was affirmed, and we have before us an appeal from the judgment of that court.

The particular finding of fact by the commission which has given rise to the discussion is as follows: "That the present disability of the applicant can be greatly relieved by a surgical operation, the risk of which is inconsiderable in view of the seriousness of the disability. That the defendants are entitled, if they shall tender such operation at their own expense and it shall be refused by the applicant or shall be accepted and successfully performed, to have the partial disability indemnity herein provided reduced or terminated as the result of the operation, if performed, may warrant."

It is to be observed that when the opinion was filed the commissioners were in doubt as to the feasibility of such operation, but at the time the findings were filed they were apparently convinced that the service should and could be performed.

As to the first criticism of appellant it is apparent that the commission did not require nor attempt to require medical or surgical service in excess of one hundred dollars. It was only a recommendation that the additional service be proffered. Granting that no authority exists in the law for such recommendation, we find it decided, in *Southwestern Surety Ins. Co. v. Pillsbury*, 172 Cal. 768, [158 Pac. 762], that "An award of compensation, which is otherwise in due form and complete in itself, is not invalidated by the fact that it in-

cludes an optional right to the insurance carrier, which if accepted by it, would compel it to pay for surgical services rendered later than the ninety-day period following the accident.'' It could not vitiate the award, but may be disregarded, as would be any other gratuitous suggestion or recommendation.

The point, however, to which appellant seems to attach the most serious consideration is that the refusal of an injured employee to undergo an operation to relieve him is ground and reason for terminating his compensation. As to this, though, it must be said we have before us no such case. There is no finding that the employee has refused to undergo an operation. There could be no refusal without an offer or direction or demand, and it is apparent there has been none of these. The finding does indeed suggest and advise that there be such an offer, and it implies that it may be refused. There is also a promise that if such condition should develop, the indemnity may be reduced or terminated. This, however, looks to the future, and cannot be regarded as of any present practical value. There is no finding even that the applicant is unwilling to undergo an operation or that he has declined to submit to one. Nor are we informed that the applicant is in a position to secure the services of a surgeon who can perform the operation. The fact is, and it must be manifest upon a moment's reflection, that said finding is of no material importance in the determination of the cause. It may be entirely disregarded without doing violence to any rule of practice or procedure. The recommendation as to the ''tender of the operation'' must be eliminated, as we have seen, and we have left nothing but the bald statement that ''the present disability of the applicant can be greatly relieved by a surgical operation, the risk of which is inconsiderable in view of the seriousness of the disability.'' It is not supplemented or qualified by a single fact indicating any remissness on the part of the applicant or, for that matter, of the Surety Company. It points to no concrete fact or circumstance imputing negligence to the applicant or to the Insurance Company. It does not affect in the slightest the present right of the applicant to receive indemnity nor the claim of appellant to have the payment reduced or discontinued. Rejecting this finding, therefore, as a mere generalization, we have left in the other findings ample support for the award.

But suppose we consider the case as though the applicant had refused or declined to submit to the surgical operation, and what would be the consequence? Upon this theory, should the award be annulled? In this consideration is involved, of course, the general rule as to the care required of the injured person to mitigate the trouble and promote recovery. Probably the rule is as well stated as anywhere in 8 R. C. L. 447, as follows: "It has been pointed out that one who has suffered personal injuries through the negligence or wrongful acts of another is bound to exercise reasonable care and diligence to avoid loss or to minimize the consequences of such injury, and that he cannot recover for so much of his damage as results from his failure to do so. Thus he is bound to exercise reasonable diligence in securing medical or surgical aid, take all reasonable care of the injury and to make use of reasonable means to prevent aggravation of it or to effect its speedy and complete cure. He is not required to take the best care of his injuries, however, nor to employ the means best adapted to heal them. It is sufficient that he act in good faith and with due diligence and that he exercise only ordinary care and reasonable or ordinary prudence of judgment."

Necessarily, said rule implies that the sufferer is able to employ the means that are needed to alleviate his situation. It would be a strange law that would require him to act with ordinary care and prudence and yet penalize him because of his inability, through indigence or otherwise, to avail himself of the remedy. An impossible or unavailable remedy is, of course, no remedy at all. If the injured person cannot appropriate the means, the effect as to him is the same as though they did not exist. His inability, unless shown to be the result of his own negligence, must be a complete answer to the charge of culpability. And, in considering the finding, we must assume that the applicant was in no position to avail himself of the operation; in other words, that it was practically impossible for him to adopt the course contended for by appellant. If we look to the evidence, we find that such was actually the situation. He said he had thought of the recommendation of the physicians to get a specially fitted shoe, "but I didn't do it, because it would cost too much, and I haven't had more than a dollar at a time since they cut me down." Furthermore, he declared he had no money "to pay for special plates or hospital fees or an operation." It also

appears that he was in debt to the extent of five hundred dollars for medical treatment which he had already received. It is fair to infer from the testimony of one of the physicians that the suggested operation with the necessary subsequent treatment would cost four or five hundred dollars, and there is nothing in the record to show that the applicant had the means or credit required for the purpose.

The foregoing ought to be sufficient to excuse and justify the applicant for his failure to take any affirmative action in the matter, but another reason also appears in the record that might properly cause a prudent person to hesitate before submitting to the recommended ordeal. It appears that he had submitted to an operation on two different occasions with but little, if any, benefit, and that he had consulted with Drs. Stephenson and Shaw, who told him that his leg "was as good as it ever would be, that it couldn't be improved on," and that nothing else could be done to improve it. He also consulted Dr. Garrett, who said he "didn't see where an operation would benefit, and that there was probably one chance out of a hundred of it doing any good, and that I couldn't have any more motion in the ankle than I had now, and I wouldn't have, no matter how straight the leg was, and it would hinder me walking stairs and that kind of thing, and that he considered me, as far as my trade was concerned, to be totally disabled." Assuredly the foregoing furnished the basis for a rational belief on the part of Marshall that the supposed benefit from an additional operation was problematical, and it justified his disinclination or refusal to take the chances.

Indeed, one of the physicians who testified at the hearing declared: "If that was in my own family, I wouldn't rely on my own judgment; I would take him back to Dr. John B. Murphy, or a man of that character, but I would be very, very doubtful of any good results to be obtained in that limb." It is true that other physicians testified that the operation could be performed with great promise of success and without serious danger, and the commission so found, as we have seen; but, after all, that is simply a matter of opinion, and it cannot be said that the applicant was bound to follow that opinion at his peril.

The applicant himself aptly sums up his reasons for declining the operation in these words: "They said that I had to

pay for the operation, and I didn't think an operation would do me any good; also, that I didn't like to take chances of going under another anesthetic.''

We are satisfied that any just view of the case must lead to the conclusion that he should not be penalized for his conduct under the circumstances herein disclosed.

Many cases have been cited by appellant, but they are not particularly in point. They are instructive, however, as illustrations of the application to certain conditions of the general principle to which we have already adverted. To a few of these we may devote brief attention.

The case of *Pacific Coast Casualty Co.* v. *Pillsbury*, 171 Cal. 319, [153 Pac. 24], really involves an injury incurred not in the course of the appellant's employment. It seems that the applicant's arm was broken while in such employment, that it was properly treated and was progressing favorably when, during a trip not for or in the service of the employer, the bone shifted or slipped so that it had to be rebroken and reset. It was held that the law did not authorize an award for the additional injury sustained by him, aggravating the first injury and prolonging the disability, for the reason that this additional injury was incurred while he was not in the employ of the company. No such question manifestly arises here.

In *Fidelity & Deposit Co. of Maryland* v. *Industrial Accident Commission*, 171 Cal. 728, [L. R. A. 1916D, 903, 154 Pac. 835], the applicant was injured while driving his automobile in excess of the speed limit provided by the state Motor Vehicle Act, and it was very properly held that this violation of a state law amounted to willful misconduct which disqualified the employee. There is no contention that in the case at bar Marshall was guilty of any disobedience of orders or violation of law that could be construed as willful misconduct.

Several cases from foreign jurisdictions are cited wherein it was held that the applicant was not entitled to compensation, for the reason that he had refused an operation, but, while it does not explicitly appear that the services were offered at the expense of the employer or insurer, such is a reasonable inference from the language of the opinions therein. It is at least clear that the cases were decided upon the principle that the injured person must "avail himself of such reasonable remedial measures as are

within his power," or, as expressed in one of the cases: "A workman must behave reasonably or his incapacity is the consequence of his own unreasonableness. To hold to the contrary would lead to this result, that a workman who had an injury, however small, might refuse to allow it to be dressed and let a trifling burn, say, become a sloughing sore and lead to partial or total incapacity."

Probably no more satisfactory consideration of this question can be found than in *Lesh* v. *Illinois Steel Co.*, 163 Wis. 124, [L. R. A. 1916E, 105, 157 N. W. 539], a recent decision of the supreme court of Wisconsin, wherein the leading cases are reviewed. Therein the applicant had injured his leg and after a certain date claimed compensation for permanent disability. The accident commission found that the present disability resulted from the workman's own willful refusal to submit himself to safe medical treatment, and he was denied further compensation. Among the interesting declarations of the court was the following: "No question of compelling the applicant to submit to an operation is involved. The question is: Shall society recompense a workman for a disability caused by his unreasonable refusal to adopt such means to effect a recovery as an ordinarily prudent person would under like circumstances and which would result in the removal of the disability within the rule as stated above? . . . The proposition that an applicant, under the provisions of this humane law, may create, continue, or even increase his disability by his willful, unreasonable, and negligent conduct, claim compensation from his employer for his disability so caused, and thereby cast the burden of his wrongful act upon society in general is not only repugnant to all principles of law, but is abhorrent to that sense of justice common to all mankind." How different such a case is from the one herein is apparent at a glance. The principle therein so strongly stated imperatively demands the acquittance of the applicant herein of any condemnation or censure. It cannot be said that he acted in a "willful, unreasonable, or negligent" manner, and to deprive him of the benefit of this "humane law" would indeed be "repugnant to all principles of law" and "abhorrent to that sense of justice common to all mankind."

We conclude that the judgment of the lower court is manifestly right, and it is therefore affirmed.

Chipman, P. J., and Hart, J., concurred.