[Civ. No. 6847. First Appellate District, Division Two.—May 2, 1930.]

ETHEL HAMELIN, Respondent, v. EDWARD T. FOULKES et al., Defendants; H. C. SWANSON et al., Appellants.

Barry J. Colding and Theodore Hale for Appellants.

M. Mitchell Bourquin and Ford, Johnson & Bourquin for Respondent.

SPENCE, J.—An action for personal injuries was brought by Ethel Hamelin, respondent, against Edward T. Foulkes, H. C. Swanson and H. C. Swanson Company. A motion for nonsuit was granted as to the defendant Foulkes. The jury

rendered a verdict in the sum of $10,000 in favor of respondent and against the appellants H. C. Swanson and H. C. Swanson Company. This appeal is taken from a judgment entered upon the verdict.

Respondent sustained her injuries on the night of November 6, 1926. While alighting from an automobile she stepped into an open hole in the sidewalk occasioned by failure to maintain a proper covering upon the sidewalk hydrant box in front of appellant's store in the Webster block in the city of Oakland. The defendant Foulkes was the lessor of the premises known as the Webster block. The building consisted of stores on the ground floor, offices above and basement below. Appellants were the lessees of a portion of the premises described in the lease as that certain store and basement thereof known as 361 and 363 Twelfth Street. Each of the stores on the ground floor had its own hydrant box in front of the store. A water hydrant was housed in each hydrant box for use by the tenant in the washing of windows, cleaning of sidewalks or for whatever purposes the tenant desired. The hydrant in front of each store was connected with the water meter of that store and each tenant paid his own water bill. The hydrant boxes were cut in the concrete near the curb and were approximately ten inches square. The openings were covered by iron gratings. The basement referred to in the lease extended under the sidewalk and appellants' water-meter for their store and basement was in the basement almost directly under the sidewalk hydrant box. Sidewalk elevators were used leading to this basement. The only keys to the basement were in control of the appellants and access to that portion of the building could be had only through appellants' store or through the sidewalk elevators. The lease of these premises was made in August, 1922, and the injuries were sustained by respondent more than four years later. The grating used to cover the hydrant box in front of appellants' store had been broken for more than a month prior to the accident and a portion thereof was being displaced constantly, thus leaving the opening unguarded. Appellants had knowledge of the dangerous condition for a month or more prior to the accident. According to appellants, they reported the matter to the lessor, but did nothing more.

On this appeal numerous specifications of error are urged in the giving and refusing of various instructions. Primarily the questions involved in these specifications depend upon whether the appellants, as lessees of a portion of the building involved, are liable for the injuries to the respondent. In brief, appellants contend that the liability rested solely upon the lessor and not upon the lessee. With this proposition we cannot agree. ■ The lessee and not the lessor is ordinarily liable for injuries to third persons occasioned by the negligence of the lessee or due to a defective condition of the premises occurring after the beginning of the lease. (*Rider* v. *Clark*, 132 Cal. 382 [64 Pac. 564]; 15 Cal. Jur. 737, par. 150.) This liability of the lessee exists irrespective of the covenants of the lease relating to repairs, and arises by virtue of his exclusive possession and control of the premises. ■ The right of the lessee to possession and control of the premises is accompanied by a corresponding duty to exercise ordinary care in the use and maintenance of the premises so as not to occasion injuries to third persons. ■ That such liability ordinarily is imposed solely upon the lessee, with certain exceptions hereinafter noted, is conceded by appellants, but it is contended that the general rule applies only where the possession and control of the entire premises passes by the lease and does not apply to the facts in the present case where only a portion of the building was leased and the injury was occasioned by failure to properly maintain a sidewalk hydrant box. There would be much force in this contention if the hydrant box was appurtenant to the entire building rather than to appellants' store, but where the hydrant box was solely for the use of appellants' store and was connected with appellants' meter, the lease of the store and basement to appellants passed with it the possession and control of the hydrant box as an appurtenance thereto. "A lease of a part of a building passes with it, as an incident thereto, everything necessarily used with or reasonably necessary to the enjoyment of the part demised. . . . The general rule is that where a store is leased, everything then in use for the store, as an incident or appurtenance, passes by the lease." (*Runyon* v. *City of Los Angeles*, 40 Cal. App. 383, 387 [180 Pac. 837].) ■ Much stress is placed upon appellants' testimony to the effect that they did not use the hydrant. However, it is

not the actual use which is important, but the right to the exclusive possession and control which governs.

■ The general rule and the exceptions thereto are stated in *Rider* v. *Clark, supra.* The court there said at page 386: "When the tenant enters into possession under a lease, the landlord parts with all his right to and control over the premises, and is not liable to third persons, except for such defects in the premises or defective construction as existed in the premises when let to the tenant. . . . 'It is well settled that a landlord is not liable for such consequences unless, . . . 1. The nuisance occasioning the injury existed at the time the premises were demised; or 2. The structure was in such a condition that it would be likely to become a nuisance in the ordinary and reasonable use of the same for the purpose for which it was constructed and let, and the landlord failed to repair it; or 3. The landlord authorized or permitted the act which caused it to become a nuisance occasioning the injury.' "

■ Appellants seek to evade liability under the second exception above noted, claiming that at the time the lease was made the hydrant box was in such condition that it would be likely to become a nuisance in the ordinary and reasonable use thereof. We find nothing in the record which would warrant a finding that at the time the lease was made in 1922 the cover of the hydrant box was in such condition, but if such were the case it would only operate to impose a liability upon the lessor. It would not serve to relieve the lessees from the duty imposed upon them by virtue of their possession and control of the premises, nor permit them after notice of a defective condition, to sit idly by and fail to use ordinary care in protecting the public therefrom.

■ No reference has been made thus far to the terms of the lease between the lessor and the lessees. It was provided "that all repairs to the demised premises shall be made by and at the sole cost and expense of the lessee and said lessee hereby waives all right to make repairs at the lessor's expense under the provisions of section 1942 of the Civil Code of California." There were other provisions regarding damage, alteration and repairs, including a provision for restoration by the lessor in the event of partial destruction of the premises with a waiver by the

lessees of the provision of section 1932 and subdivision 4 of section 1933 of the Civil Code. Reading the provisions of the lease together, it appears that the duty was upon appellants to make such repairs as were here required. There can be no question under these circumstances concerning the lessees' liability for injuries resulting from the failure to exercise ordinary care in keeping the premises in a safe condition. (*Runyon* v. *City of Los Angeles,* 40 Cal. App. 383, 390 [180 Pac. 837].) As heretofore stated, the duty is imposed upon the lessee by reason of his exclusive possession and control, and it has been said that "a covenant by the tenant to repair but enforces his liability." (15 Cal. Jur. 740, par. 152.)

Considerable space in appellants' briefs is devoted to a consideration of cases which have sustained liability against the lessor under certain circumstances. The question here involved is not whether the lessor might also be held liable, but whether the liability may be properly imposed upon the lessees. This is an appeal from the judgment against the lessees and is not an appeal from the judgment of nonsuit granted upon motion of the lessor. ■ The duty to use ordinary care to keep the premises in a safe condition having been imposed upon appellants both by virtue of their exclusive possession and control of the premises and also by the covenants of the lease regarding such repairs, we find no prejudicial error in the giving or refusing of any of the instructions relating thereto.

■ Appellants further contend that the damages were excessive and that respondent failed to use ordinary care and diligence in procuring medical or surgical treatment following the injury. On November 6, 1926, when respondent's foot went into the open hole she was thrown to the pavement and her foot was thereafter pulled from the hole. Her leg was wrenched, but the main injury was to her back and spine, more particularly to the sacro-iliac joint. The respondent suffered severe pain, but the injury appeared to consist of nothing more than a severe wrenching. She was immediately put to bed, her back was strapped and relief was attempted by means of the application of home remedies by her mother and sister. She remained in bed the following day and on Monday, the second day following the accident, she returned to her work as saleslady. In spite of severe

pain and loss of sleep she continued her work under difficulty until December 22, 1926. She had consulted Dr. Boscowitz in the latter part of November or first part of December, and on December 22 he ordered her to bed. She remained in bed for six weeks under treatment consisting of taping and electrical treatments. She then began treatment with Dr. Hitchcock, who ordered her to wear a surgical corset and to have boards under the mattress to keep her firm. In April, 1927, she consulted Dr. Hunkin, who prescribed a different form of corset, the wearing of a higher heel on the right shoe, and gave her certain injections. Thereafter, during the spring of 1927, she sought relief from Dr. Fraser, an osteopath, whose treatment consisted of adjustments and manipulation of the spine, which treatment continued up to the time of trial in November, 1928. At the time of the trial, a little more than two years after the accident, she testified that she was never free from pain; that her legs became numb and cold at frequent intervals; that she did not sleep well at night; and could not eat as well as she formerly did; that she could not sit up all day because she became exhausted; that she could not stay on her feet more than ten minutes at a time, and that she was still wearing a surgical corset, sleeping with boards under the mattress and wearing specially constructed shoes. She had lost considerable weight during her suffering. Shortly before the trial she was examined by Dr. Cleary, who testified for respondent, and Dr. Cary, who testified for appellants. Although not entirely in accord in all details, both agreed that respondent had suffered an injury to the sacro-iliac joint, the exact nature of which injury was described by the use of X-rays. Dr. Cleary testified that she was absolutely incapacitated for active work and that he did not consider that treatment by surgical operation or otherwise would completely restore her to capacity. He stated that after the best could be done for her, she could never undertake any vigorous employment and would have to forego the possibilities of motherhood. The only hope of recovery held out by Dr. Cary, appellants' witness, was by means of a surgical operation which he termed the Smith-Peterson-Cary operation, which surgical procedure would result in incapacity for three to five months. Prior to the injury the testimony showed that respondent was a woman thirty-one years of

age, in good health and regularly earning $150 per month. At the time of the trial respondent had already expended $333.50 for treatment of her injuries and had lost earnings in the sum of $3,450. Further facts could be set forth, but a recital of the above testimony is a sufficient answer to appellants' claim that the damages were excessive. ■ It is fundamental that upon appeal the verdict will not be set aside upon this ground unless it is so plainly excessive as to suggest at first blush passion, prejudice or corruption on the part of the jury. .

■ Nor do we find any merit in the claim that respondent failed to use ordinary care and diligence in procuring medical or surgical treatment following the injury. The exact nature and extent of the injury were unknown to respondent. It should be noted that medical men were not in accord on this subject, nor upon the proper treatment for the relief of her condition. Respondent obtained medical treatment upon discovering that her injury amounted to more than a simple wrenching of her leg and spine and there is no evidence in the record that the failure to obtain medical treatment at an earlier date had aggravated her injury. The evidence is ample to show that respondent acted in good faith and exercised ordinary care and diligence, which is all that is required. (*Marshall* v. *Ransome Concrete Co.*, 33 Cal. App. 782, 786 [166 Pac. 846].)

The judgment is affirmed.

Nourse, P. J., and Sturtevant, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on May 29, 1930.