[Civ. No. 3168. Fourth Dist. Dec. 19, 1944.]

J. G. BOSWELL COMPANY (a Corporation) et al., Petitioners, v. INDUSTRIAL ACCIDENT COMMISSION and JACK OWINGS, Respondents.

348

 

Keith & Creede for Petitioners.

Everett A. Corten and Dan Murphy, Jr., for Respondents.

BARNARD, P. J.—This is a proceeding to review an award of the Industrial Accident Commission in favor of Jack Owings, holding that he sustained a 100 per cent permanent disability and awarding him $5,445.60, payable over 240 weeks, $13.96 a week thereafter for the duration of his life, and also medical and hospital care, including insulin, for the treatment and relief of diabetes, for the remainder of his life.

Owings, who was 33 years old, was employed as a caretaker and repair man in cotton gins operated by J. G. Boswell Company. In May, 1939, before any injury occurred, both of his ankles became swollen and diabetes was suspected. Hospital tests did not indicate the existence of excess sugar and the condition cleared up in a few weeks. On August 22, 1939, he was struck on the head by a pulley which had broken loose and suffered a fracture of the right cheek bone and concussion of the brain. He did not return to work until August 16, 1940, and then was usually given light work although occasionally doing some heavy lifting. He complained of nervousness and fatigue, and other troubles, when overheated or doing heavy work and occasionally laid off for a few days. On March 25, 1943, he carried some heavy sacks of sand in some emergency work, during which he collapsed. On April 1, 1943, he felt something wrong with his left foot, and this seems to have developed into a partial paralysis of the left leg. He continued to work until April 10, 1943, and shortly thereafter was examined by Dr. Howard Brown, a brain specialist of San Francisco, who reported that the condition of the left leg was due to pressure on a nerve caused by a ruptured intervertebral disc, and that this condition was not related to the injury of 1939.

Thereafter, an application was filed with the Industrial Accident Commission and hearings were held over a consid-

erable period, the applicant being represented by two able attorneys of Hanford. Finally, on April 10, 1944, an award was made as above indicated. A rehearing was asked for largely on the ground of bias on the part of the referee who had conducted the hearings and that a fair and impartial hearing had not been had. A rehearing was denied and this proceeding followed.

While the petitioners concede that there is some evidence in the record to sustain the findings made, it is earnestly contended that the award should be annulled and a rehearing ordered because the record clearly discloses such bias on the part of the referee as prevented them from having a fair and impartial trial, and that in certain respects they have never had their "day in court." We think this contention must be sustained.

At the first hearing, the applicant testified and a report by Dr. Rosson was introduced which described the conditions found but did not express any opinion as to the relation between the disability and the injury of August 22, 1939. The report of Dr. Brown was also introduced. Before any other evidence was introduced the referee remarked that this last report was "a surprising report to me," and criticized it "with all due respect to Dr. Brown's eminence as a specialist in this line" because it failed to comment on the significance of the fact "that this man's brain was injured on the right side and there is an affection of his left lower extremity." In reply to counsel's suggestion that he was not a doctor and a question as to what was his diagnosis the referee replied: "My diagnosis is that he got an injury to the right side of his brain, and that there is some involvment there in the brain that has affected the other side of his body, affected his leg." The referee then stated: "I have just as much right to deal with conjectural language as Dr. Brown" and that when "you see a man that's got an injury like that, and he claims symptoms that are reasonably attributable to that injury, and in the general nature of things, then, you don't have to speculate and guess at three or four other things that could possibly be the cause of it, when the most reasonable cause of it is right before you." When reminded that Dr. Brown stated that these were not the centers that were affected the referee remarked "I am simply not impressed by Dr. Brown's report." The referee then remarked that you don't have to be a nerve specialist in a case like this but that "you are liable to get a better report from a general

practitioner than a specialist." He then suggested that the applicant should be examined by Dr. Mathias of Tulare.

The applicant was examined by Dr. Mathias who filed a report stating that he had suffered a recent partial paralysis of the left leg and expressing the opinion that this was an after-result of his original head injury. At the next hearing Dr. Mathias was cross-examined. He expressed the opinion that specialists should be consulted. It then developed that the insurance carrier had arranged for the applicant to be again examined by Dr. Brown but that the applicant had refused because he was told by an office assistant that Dr. Brown intended to make another spinal test. The applicant had had three such tests previously, and the referee interrupted the proceedings several times to express himself very forcefully that the applicant did not have to subject himself to a spinal puncture. Dr. Mathias then testified as to why he thought the present leg condition was related to the old head injury and said that any use of alcohol was not advisable for a patient in this condition. The referee then attempted at some length, but without much success, to get him to confirm the fact that such a brain injury might later lead to diabetes. The doctor stated that he knew nothing about it. This is the first mention of diabetes in the record. At this hearing a report from Dr. Eidenmuller of San Francisco was introduced. He attributed the present condition of the left leg of the applicant to the accident of August 22, 1939. He attributed some of the applicant's symptoms and complaints to diabetes, which he said became severe in January, 1943. He further stated that it would be natural to believe that the onset of the severe diabetes and the leg condition which developed some months later may have a common cause in the brain injury sustained in 1939; that, on the other hand, it is possible that the severe diabetes caused the leg condition; and that if the records of two hospitals failed to show the presence of diabetes at the times the applicant was in these hospitals then the connection of the diabetes with the accident would be more remote (it was later shown that the records of these hospitals failed to show this situation).

It appears that some time before, when the applicant went to San Francisco at the request of the insurance carrier for further examination by Dr. Brown and refused to be so examined, he had gone to see the referee at his San Francisco office. The referee sent him to Dr. Eidenmuller and talked to that doctor before the report was made. This general

situation and the surrounding circumstances resulted in considerable controversy at the subsequent hearings.

At the next hearing, Dr. Eidenmuller was cross-examined. He testified that he had examined a clinical report on the applicant made in May, 1939, about three months before the first accident, and that this indicated to him that at that time the applicant might have had a mild case of diabetes and that when the applicant came to him in San Francisco the first thing he did was to make an investigation with respect to the presence of diabetes. He further testified that tests could be made which would determine whether this diabetes was a result of the injury suffered in 1939 or whether it came from other causes.

At an earlier hearing counsel for the insurance carrier had attempted to introduce evidence of intoxication on the part of the applicant over several months preceding April 1, 1943, and of his arrest and conviction for disturbing the peace on March 26, 1943. Under the testimony of the doctors this had a bearing on the diabetes situation, and also on the leg condition. The referee had then stated that this evidence was not material but had later stated that at a subsequent hearing he would admit any such evidence because "its conceivable that a man might, through some melee that occurred, injure himself in some way, so I can't refuse it without jeopardizing the record." Also, at an earlier hearing one of the attorneys for the applicant had expressed great confidence in Dr. Shepardson of Stanford as an expert on diabetes and had requested that the applicant be examined by him, which was done.

At a subsequent hearing petitioners had witnesses present and attempted, by questions and by offers of proof, to show intoxication and arrest for intoxication on the part of the applicant over the period in question. The referee refused to permit any evidence along this line as immaterial, and stated that it had no relevancy either on the issue as to the condition of the applicant's leg or on the issue of whether or not his diabetes was the sole result of his head injury. The referee remarked "I don't propose to have you read into this record a lot of matter about intoxication that might lead to someone reviewing the record—make him perhaps believe that the man is a chronic drunkard." In refusing to permit an officer from the applicant's home town to testify in this regard the referee said: "Corcoran is a small place, and they may have high moralism down there. Maybe if a fellow makes

a misstep and smells like he'd been hit with a beer towel, they throw him in the can." The hearing was then adjourned to wait for the report of Dr. Shepardson.

Subsequently Dr. Shepardson's report was filed. He stated that he had examined the applicant with regard to the relationship between his diabetes and his 1939 head injury, that the applicant was suffering from diabetes but was making "no serious effort to keep it under adequate control" in that he was not following the diet prescribed for him by Dr. Eidenmuller, and that he was not taking insulin as he had been directed. He expressed the opinion that this diabetes was not related to the 1939 injury and gave his reasons for that opinion, the main one of which was that in cases where trauma causes diabetes or changes a potential diabetic into an acute diabetic the diabetes should become apparent within three or four months of the time of the injury. He also referred to the possibility of alcoholism contributing to diabetes.

There is some mention in the record of a report by Dr. Addis, another expert on diabetes, who is said to have confirmed Dr. Shepardson's views, but if this report is in the record we have not found it.

About this time the referee met Dr. Olsen of San Francisco in the office of the commission and told him about this as a very interesting case and said he was going to send the applicant to him for examination. The referee stated at the next hearing that he was not satisfied with Dr. Shepardson's report; that he "didn't like the way it read"; that he sent the applicant to Dr. Olsen "because I wanted a report from a doctor that I believed was—capable of giving him a thorough examination"; that he wanted to check on Dr. Eidenmuller; and that "I wanted to see what *another good man* had to say about it." (Italics ours.)

After examining the applicant Dr. Olsen called the referee and told him that "My examination would confirm Dr. Eidenmuller." He then filed a report expressing the opinion that heavy lifting preceding April 1, 1943, had "precipitated more hemorrhage into the brain injury of August, 1939." With respect to diabetes the report states that there is considerable controversy as to whether a brain injury can cause diabetes, that he believes it did so in this case, but that further investigation should be made to locate the cause of the trouble. On cross-examination, Dr. Olsen testified that since diabetes is sometimes caused by a brain injury and since there was no history of diabetes in the applicant's family he concluded

that this diabetes was due to the brain injury; that ordinarily diabetes comes on within a few weeks after a brain injury; that the applicant could have had a "low grade diabetes" for a long time; that sometimes this occurs and later the disease becomes active; that when it becomes severe and recognizable, as in this case, you cannot say when it started; that the applicant's diabetes preceded, and was not caused by, the further hemorrhage in April, 1943; and that a latent diabetes could be brought on and developed by a man's indiscretion in his diet and also by the use of alcohol.

Counsel for the insurance carrier then asked the referee to refer this case to the medical department of the commission for an impartial opinion. This request was denied. The referee then filed his findings and award. A petition for a rehearing was filed and apparently the question as to whether a rehearing should be granted was referred to another referee for a report. The report of this other referee is before us. With commendable frankness and honesty this report briefly, but fairly, reviews the evidence and the proceedings and points out that the findings and award to the effect that both the leg condition and the diabetes were proximately caused by the injury had been entered despite the fact that Dr. Eidenmuller had merely given a tentative opinion that the injury was the proximate cause of the diabetes; that Dr. Eidenmuller had also stated that it could be determined by certain tests whether or not the diabetes was the result of the brain injury; and that "these final tests were not made at the time of issuance of the findings and award." The report then points out that the disability in the applicant's left leg developed immediately after "the applicant was incarcerated in jail as a result of a drunken brawl"; that the record discloses that the defendants were prepared to offer proof of other incidents of intoxication; and that the referee refused to admit such evidence "because, as he stated, even if the doctor said that these conditions were caused by alcoholism he would not believe it." The report then states that whatever may be said as to the possibility of bias on the part of the referee it seems certain that the defendants had not been allowed their day in court and were entitled, especially in view of the medical evidence including that of Dr. Eidenmuller and Dr. Olsen, to produce evidence with respect to the use of intoxicating liquors and

that it was at least necessary to grant a rehearing on that ground. The report then contained the following:

"As to the bias of the referee in favor of applicant and the incidents cited by the defendants in reference thereto, I believe that it would be dangerous to present this picture to our Appellate Courts because of the very nature of our work and our general desire to aid the injured workman as it is necessary for each referee from time to time to render assistance to the applicant and advise him as to his rights and in respect to the evidence that he should produce. A curtailment of this practice by all our referees would result in great danger to all workmen who appear before this Commission for redress on account of their industrial injuries. Therefore, as the active participation of the referee in this case seems to go beyond the usual bounds of aid and assistance rendered to applicants when the burden is put upon the referee to make a decision in the case, there is a danger that a writ in this case would result in some particular law in respect to the laudible practice of all referees in rendering aid and assistance to the injured workmen.

"It must be understood that in this case I am in no way commending the actions taken by the referee in this case. The intent of the referee was laudible in every respect and the most that can be said is that perhaps he was a little indiscreet in going as far as he did and in allowing the record to so plainly indicate from the very beginning that it was his intention to issue the most favorable award to the applicant, no matter what the evidence might disclose."

The report concludes with a recommendation that a rehearing be granted, and that the matter be assigned to another referee for such hearing. This recommendation was not followed and a rehearing was denied.

This case is a close one, especially with respect to the question as to whether or not the applicant's diabetes is related to the 1939 injury. It clearly appears that the petitioners were entitled to produce and have considered evidence as to the use of intoxicants in connection with that question. It also appears, from the testimony of the doctors chosen by the referee, that the question as to whether the development of the diabetes was to be attributed to the head injury could be determined by tests which were suggested but that this was never done. Moreover, we think bias on the part of the referee who made the findings clearly appears. What-

ever the actual facts and the final decision may be, it would be a travesty on justice to say that the petitioners have had a fair and impartial hearing. Before any medical evidence to that effect had been introduced the referee jumped to the conclusion that because the injury was to the right side of the head and the subsequent trouble appeared in the left leg it must follow that they were directly connected. When it later appeared that the applicant was also suffering from diabetes this theory was extended to cover that. When two experts in that field later gave a contrary opinion the referee, not liking the way that report read, sought the advice of another doctor. When a report more to his liking was obtained he decided the case without requiring the determinative tests which had been suggested, and after shutting out a line of evidence which even the testimony of his own doctors had shown to be most material. In effect, he took the case away from the applicant's attorneys and proceeded to seek out for himself the sort of evidence he desired. While this might not be entirely improper in some cases, it rather clearly appears here that this was done not for the purpose of bringing out the true facts but rather to confirm and support the position originally taken by the referee. As the other referee aptly expresses it, the record here plainly indicates that from the very beginning it was the intention of the referee who heard the matter "to issue the most favorable award to the applicant, no matter what the evidence might disclose."

The second referee expressed the fear that, because bias so clearly appears here, an appeal in this case might result in the laying down of rules which would be harmful in other cases. While this case is a flagrant one, we think it is unusual, and that it is unnecessary to suggest any general rules. It may be conceded, for present purposes, that a referee may at times properly advise an applicant with reference to a matter of procedure and that he may, under some circumstances, furnish him assistance in the presentation of his case, but such activities should be carried on only for the purpose of bringing out the true facts and to the end that a fair and impartial hearing may be had. In the instant case, the referee was not only a partisan but an intense partisan at all times after he gave his own diagnosis in opposition to the only medical testimony then in the record. This is disclosed not only by the portions of the record to which we have referred,

but by innumerable other portions which we have not attempted to set out because to do so would make it necessary to unduly prolong this opinion by including many pages of explanatory matter.

We feel confident that not one of the commissioners would have voted against a rehearing in this matter if he had read the full transcript of the proceedings.

█ The respondents argue that the petitioners should have voiced their objection to the referee in accordance with the provisions of section 5311 of the Labor Code; that this was not done; that the first effort to show bias on the part of the referee before the commission itself appears in the petition for a rehearing; and that they should not now be allowed to raise this point. Section 5311 relates only to objections to the appointment of a particular referee and does not cover the situation which here arose. The bias on the part of this referee in no way appeared until the case was well under way and it was disclosed not by one incident but by a succession of matters appearing throughout the hearings. On several occasions, late in the proceeding, counsel for the petitioners suggested to the referee that he should disqualify himself, which he refused to do. As a practical matter, the petitioners were in a difficult position and under the circumstances they should not be held to have waived their rights by allowing the matter to proceed until they could seek relief through a petition for a rehearing. In any event, it is to the interest of both the public and the commission that this decision be not allowed to stand and that the entire matter be considered and decided after a fair and impartial hearing.

For the reasons given, the award is annulled and the matter is remanded for a new hearing.

Marks, J., and Griffin, J., concurred.