[Civ. No. 12883. First Dist., Div. One. July 30, 1945.]

BETHLEHEM STEEL CORPORATION (a Corporation), Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and PAUL WELDON McCLURE, Respondents.

R. P. Wisecarver for Petitioner.

Everett A. Corten and R. C. McKellips for Respondents.

PETERS, P. J.—Petition for a writ of review.

The commission found that Paul McClure was injured in the course and scope of his employment with Bethlehem Steel Corporation, a self-insured employer, in September, 1942; that he then sustained a dislocated intervertebral disc; that such injury has resulted in 100 per cent permanent disability; that the employee is entitled to such medical treatment as may reasonably be required to relieve him from the effects of such injury during his life; and that the employee's refusal of further medical and surgical treatment offered by the employer is not unreasonable. Petitioner's main contentions are that the last mentioned finding, when tested by the requirements of section 4056 of the Labor Code, is unsupported by any substantial evidence, and that petitioner was deprived of a fair and impartial hearing because of the alleged bias and prejudice of the referee.

The facts are as follows: In 1942 McClure was employed as a welder by Bethlehem. On September 29th of that year, while working in a cramped position, he experienced a "popping" sensation in his back. For a few minutes he was unable to walk, but finally was able to get to the employer's first-aid station, where an attendant, not a physician, taped his back. He was in considerable pain, and it was with some difficulty that he got home. The next morning he was unable to get out of bed and was removed, by the employer, to a hospital, where X-rays were taken. He was hospitalized for four days and given electro-therapy treatments. Dr. Barrett, a plant physician for Bethlehem, told McClure that he probably had a pulled ligament or muscle. After his stay in the hospital McClure went back to work. He reported several times to the first-aid station and had his back taped. He suffered considerable pain and after about a month he bought a belt. He continued to work, in spite of the continuous pain, until October, 1943. In that month he had to quit work and was again examined by Dr. Barrett at the plant hospital. Dr. Barrett referred him to Dr. Hand, an orthopedic specialist. A letter from Dr. Hand to Dr. Barrett, dated November 11, 1943, states that McClure "has the signs and symptoms of low back strain and nerve root irritation. . . . These findings

are consistent with a ruptured disc between lumbar four and five. I believe it would be advisable to manipulate his back under a spinal anaesthetic and apply traction to both legs.'' McClure was sent to the hospital where he was put in traction for five or six weeks. After his release he went back to work, but continued to suffer pain. In March of 1944 Dr. Barrett sent McClure to a physiotherapist, who gave him several treatments. These seemed to aggravate the condition. It became very difficult for him to walk. He reported to the hospital and a company doctor, who was substituting for Dr. Barrett, told him that he had rheumatism and arthritis, that he ''would never be cured,'' and that he should retire and take a trip around the world. This doctor had an interne tape McClure's back. The condition continued and in May of 1944 McClure called at the commission and asked what he should do. The commission sent him to Dr. Dozier of Bethlehem who, in turn, sent him to Dr. Hand. Dr. Hand told him that there was a disc out, that it was cracked or chipped, but that he wanted verification. He was then sent to Dr. Jones. Dr. Hand's report, dated May 16, 1944, states: ''This man is again totally disabled and most probably has a ruptured intervertebral disc, even though he does not have atrophy, sensory changes or reflex changes. He was greatly improved by manipulation and traction. This might be worth another attempt. If unrelieved by such a procedure, he should be seen by a neurosurgeon for an opinion relative to the possibility of his having a ruptured intervertebral disc.'' The report of Dr. Jones is dated May 22, 1944. He concludes that the ''history strongly suggests that this patient has a dislocated nucleus pulposus. At the present time there are no findings from the neurological standpoint. He has, however, definite evidence of mechanical difficulty in his low lumbar spine.

''I would suggest that this patient have a Lipiodol study of his low lumbar spinal canal; and if a dislocated nucleus pulposus is demonstrated, he would then require operation for removal of same.''

At this time Dr. Barrett strongly recommended against an operation, stressing to McClure the uncertainty and danger of such procedure. On June 6, 1944, McClure filed his application with the commission asking that the nature and extent of his disability be determined. The first hearing on this application was held on June 21, 1944. At this, and subsequent hearings, McClure was not represented by counsel.

At this first hearing it was stipulated that McClure had been injured in the course and scope of his employment; that the employer was self-insured; that medical treatment had been furnished and compensation paid to date. McClure testified as to the history of his injury. A report of Dr. Olsen, dated June 20, 1944, was introduced. He concluded that the "clinical picture is typical of a protruded intervertebral disc. It should be removed." At the conclusion of the June 21st hearing counsel for the employer stated that they wanted McClure examined by Dr. Fender and, if he so recommended, an operation would be offered.

McClure was then examined by Dr. Fender. His report, dated June 24, 1944, gives a complete history of the case and indicates a complete examination was then made. The report concludes: "I think the man suffers from a dislocation of a portion of an intervertebral disc. However, and in spite of the long period of conservative management already followed, I would recommend deferring surgery in this case for the present." A letter from Dr. Olsen dated June 28, 1944, states that "when symptoms from a disc persist for such a time, surgery is imperative. His disability will be permanent until the disc is removed." A letter from the attorney of the employer to the commission dated June 28, 1944, encloses the Dr. Fender report and states that "Mr. McClure is being offered this conservative treatment recommended by Dr. Fender, or the operation suggested by Dr. Jones."

McClure replied to this letter on July 7, 1944. He therein states that early in May, 1944, he called upon Doctors Barrett and Dozier for a consultation; that Dr. Barrett told him "that an operation was necessary, but that the head physican [sic] of the Bethleham [sic] Plants advised against such an operation due to the fact that they are not succesful [sic]"; that the two doctors advised that he accept a cash settlement; that he has been examined by Dr. Fender; that Dr. Fender does not deem it advisable to operate; that he has "come to the conclusion that it would be against my better judgement [sic] to have such an operation at this time"; that he has again seen Dr. Fender but at the date of this visit the doctor had not heard anything further about the case.

Under date of July 14, 1944, the rating department of the commission recommended a 100 per cent disability rating. The attorney for the employer requested a further hearing,

which request was granted. A further hearing was had on August 25, 1944.

The record shows that prior to this hearing an effort was made to settle the case. The employer offered, and McClure agreed to accept, a $3,000 cash settlement. The referee, acting well within his powers, refused to approve this settlement, giving as his reasons that at the time he accepted, McClure, because of his injury and because of certain personal matters, was unable to exercise a free judgment in the matter, and because the amount offered was insufficient.

Before the hearing of August 25, 1944, the employer had advised McClure that he should be operated upon or perhaps try several weeks' rest in bed in a hospital. McClure had again reported to Dr. Fender, but was then suffering from a cold. The doctor had told him to come back when he was over the cold. At the hearing he testified that he had not done this because "I didn't think it was worth while going back to him." He was then asked: "Q. Will you at this time put yourself under the care of Dr. Fender for treatment? A. I don't know what he can do. I've had so many treatments. Q. I am asking you if you will at this time put yourself under the care of Dr. Fender? A. It wouldn't do me a bit of good to put myself under his care. Q. Is that your answer, you will not? A. That is true." He then went on to reply, in answer to a question from the referee, that the reason he refused treatment was that Dr. Olsen had stated that an operation was imperative and that he felt that further treatments would be useless. He then stated that he refused to be operated upon. He gave as his reasons the following: "Well, the idea is that as you know Dr. Barrett has told us that this is practically a new field of operation and it stands to reason that any operation that is a new field that can be improved on and I have talked to several people—I know one fellow personally and I have a brother-in-law that has the same accident. He has gone to the Mayo Clinic and they said yes, they would operate but he would have a stiff back the rest of his life. Q. What else did Dr. Barrett tell you when you were first discussing operation and by Dr. Barrett I mean Dr. Gilbert Barrett, the Chief Surgeon for the Bethlehem Steel Company? A. Yes, Dr. Barrett told me at the time Mr. Dozier and Dr. Barrett called me in—we were discussing operations and Dr. Barrett told me frankly that the Bethlehem would not undertake an operation of this sort and he told me that

the doctor over all the Bethlehem plants had specified to give the patient a settlement and not undertake the operation and Dr. Barrett told me then, he said that the operation is very, very dangerous. He said, 'You go in there and monkey around with the trunk line and there is all nerves and everything in your back,' and he said, 'It is very dangerous to monkey with the back.' Naturally I was scared. Q. And you still have that information he gave you and that advice in mind? A. Yes, it is just that I am afraid of it. Q. Did you discuss with Dr. Olsen about operation? A. Yes. Q. What did Dr. Olsen tell you about operation? A. He said it was dangerous. He said it was a new field and he said some fellow—one fellow out of a percentage may get over it. Other fellows may go through the operation and get over it but it will come back to them. They will either have a pain in their back or a pain in their legs.''

Dr. Fender was called as a witness and testified that the conservative treatment he would recommend before an operation was simply rest in bed for a period of two or three weeks, that the man's conservative treatment up to date had been complicated by maneuvers that had been carried on and might themselves have prevented recovery. The doctor obviously had little faith in the bed treatment. He testified that some of these cases recovered spontaneously, but that the chances of that happening in the case of this employee were dwindling down rapidly to the vanishing point. He gave it as his opinion that over half of these operations, that about 60 or 70 per cent of the cases, obtained favorable results. The employee's back, if the operation was successful, would be better than it then was, and he would be able to work, but not to lift and carry heavy things as before his injury. Again he testified that the chances were 75 per cent that he would be improved and able to return to useful work; that the operation was not dangerous to life, that it was serious only in the sense that any operation, even a tonsillectomy, is serious; that an inter-cranial operation on the brain, or an operation on lungs or heart were more serious. He was definitely of the opinion that McClure should have the operation if conservative treatment failed.

Dr. Barrett testified that he was now not adverse to an operation if conservative treatment failed. He admitted advising against an ''early'' operation. (This advice was given in May,

1944, some 20 months after the injury.) He stated: "We don't like surgery if it can be avoided and I had been told by the chief surgeon that he was opposed to early operation and any operation if it can be avoided. If not, it is applied"; that they have performed such operations "but we don't like them"; that the patient should go to bed for several weeks and if that failed to give relief he should be operated upon; that the "majority" of operative cases get a "result" if done by careful surgeons; "some don't and I mentioned to Mr. McClure when we were discussing it and urged that this be not done at this time [May, 1944]. Dr. Shoudy had told us of two cases that were unfavorable, making them more skittish than ever. Dr. Shoudy is the chief surgeon of the Bethlehem Steel. It made them less inclined to have this done."

The rating expert for the commission testified that McClure was 100 per cent disabled; that he would not guess what the rating might be if McClure were operated upon; that after such operations "some of them come out with no disability at all and some of them have severe disability afterwards"; that he has observed "several" cases of improvement after such an operation and has "seen one or two where they were worse."

On September 29, 1944, the referee made his final report. He therein explains why he refused to approve the compromise and finds that on the facts, which he reviews, the refusal to accept further medical treatment or the operation was not unreasonable; finds the disability to be 100 per cent; and finds the applicant is entitled to reasonable medical treatment for the balance of his life.

. On October 18, 1944, the commissioners filed their order disapproving the compromise and their findings and award which follow substantially those of the referee.

The employer thereafter filed a petition for rehearing, urging, substantially, the same points made on this petition. The rehearing referee recommended a rehearing and filed a report. He therein stated that in his opinion there was considerable misunderstanding in this case over the proper treatment which raised in McClure's mind a suspicion of the employer's doctors; that in the beginning they strongly advised against surgery, so that when surgery was offered he was in such a state of mind he did not want surgery at the hands of defendant's doctors but wanted a settlement so that he could go to John Hopkins; that from his (the rehearing referee's) experience

conservative treatment should first be tried before surgery; that here all the doctors agree surgery is called for and testified no great risk is involved; that in his opinion the refusal to accept the operation was unreasonable. The hearing referee also filed a report on the rehearing. At this time McClure, still unrepresented by counsel, was living in Oregon. In this report, after reviewing the evidence, the referee points out that it was not until after McClure had come to the commission for advice that surgery was offered; that prior to that it was discouraged; that they then tried to negotiate an inadequate settlement; that when this failed and they were faced with a 100 per cent disability rating, they then offered the operation; that in his opinion the refusal of McClure was reasonable. The commission denied the petition for rehearing, and that present petition for a writ of review was filed.

█ The main legal question involved is the proper interpretation and application of section 4056 of the Labor Code. It provides: ''No compensation is payable in case of the death or disability of an employee when his death is caused, or when and so far as his disability is caused, continued, or aggravated, by an unreasonable refusal to submit to medical treatment, or to any surgical treatment, if the risk of the treatment is, in the opinion of the commission, based upon expert medical or surgical advice, inconsiderable in view of the seriousness of the injury.''

It is the contention of petitioner that under this section if the medical and surgical experts agree that the risks incident to an operation are inconsiderable in view of the seriousness of the injury then the employee's refusal of medical or surgical care is, as a matter of law, unreasonable. It is also urged that the record here shows that all the doctors agreed the operation and treatment were necessary and that the risks were inconsiderable. While we may agree with petitioner's interpretation of the section, we cannot agree with its interpretation of the record.

The section above quoted is simply a codification of the general rule that aggravation or extension of an injury is not compensable—one may not recover for an aggravation of an injury caused by his own act. █ An employee is under a duty to submit to reasonable medical or surgical treatment, and, if he refuses and his injury is thereby aggravated, he may not recover compensation. (See annotations 6 A.L.R. 1260; 18 A.L.R. 431; 73 A.L.R. 1303; see, also, *Danziger* v. *Industrial Acc.*

*Com.*, 109 Cal.App. 71 [292 P. 525]; *General Acc. etc. Corp.* v. *Industrial Acc. Com.*, 77 Cal.App. 314 [246 P. 570]; *Marshall* v. *Ransome Concrete Co.*, 33 Cal.App. 782 [166 P. 846].)

■ However, it is also well settled that an employee is not compelled to undergo an operation or treatment when the outcome is problematical, uncertain or attended with real danger. (*Marshall* v. *Ransome Concrete Co.*, 33 Cal.App. 782 [166 P. 846]; see, also, Campbell's Workmen's Compensation, p. 668, § 751, and cases cited fn. 111.) ■ It is equally well settled that the question as to whether the employee has acted reasonably or not in refusing treatment is a question of fact upon which the opinion of the commission, based upon expert medical or surgical advice, is final. (*Danziger* v. *Industrial Acc. Com.*, 109 Cal.App. 71 [292 P. 525].) ■ The commission's power is, of course, not arbitrary, and its determination must be based upon competent expert evidence, unless the issue pertains to a problem properly falling within the scope of judicial knowledge. (*Southern Cal. Edison Co.* v. *Industrial Acc. Com.*, 75 Cal.App. 709 [243 P. 455].)

■ If these rules be applied to the evidence in the present record we think there is sufficient evidence, and reasonable inferences from the evidence, to sustain the finding that McClure's refusal to accept the treatment offered was reasonable. It is true that on the hearing all of the doctors testified that in their opinion McClure should be operated upon and that the risks attendant thereto were slight. But that is not all of the expert evidence that appears in the record. What the doctors told McClure also constitutes medical opinion upon which the commission could base its award. This employee had undergone every form of treatment suggested by the employer's doctors for nearly two years, and his condition had grown progressively worse. It was not until November of 1943 that Dr. Hand first suggested the possibility of a ruptured intervertebral disc. Some time later a company doctor diagnosed his condition as incurable rheumatism or arthritis and suggested that he take a trip around the world. It was not until the employee asked help from the commission in May of 1944 that an intensive diagnosis was made. Even then the specialists were doubtful as to the advisability of an operation. Dr. Jones, in his report of May 22, 1944, suggested a Lipiodol study which would have been of assistance in diagnosis and which apparently was not made, and suggested the

possibility of an operation. When the employee suggested this to Dr. Barrett, that doctor strongly recommended against an operation, stressing the uncertainty and danger of such an operation. Dr. Fender recommended against surgery as late as June 24, 1944. Dr. Barrett told the employee that Bethlehem would not undertake such an operation and that the chief surgeon for Bethlehem had directed that such operations should not be undertaken but that settlements should, if possible, be effected. He also told the employee that the operation "is very, very dangerous," and that it was very dangerous to start cutting into the trunk line. Dr. Olsen told the employee the operation was dangerous and that it was a new field and that "one fellow out of a percentage may get over it.". This is all medical evidence that creates a substantial conflict with the later opinions given by these same doctors. It is a reasonable inference from the evidence that after the company doctors had convinced the employee that the operation was dangerous and doubtful as to results, an attempt was made to settle the case. It was only after this attempt failed that the doctors unequivocally recommended an operation. Even on the last hearing Dr. Fender testified that the operation was successful in but substantially over half the cases, in about 60 or 70 per cent of the cases, later changed to 75 per cent of the cases. Dr. Barrett, while now recommending the operation, admitted that the doctors at Bethlehem do not like such operations. He also stated that in a "majority" of cases you could expect a good result, and that he knew of cases where the results were unfavorable. The rating expert for the commission testified that he knew of cases that had been benefited and others that had been injured by such operations. This was all expert evidence, based upon the opinions of doctors, upon which the commission was entitled to base its finding on the issue. The fact that these doctors later gave conflicting evidence does no more than create a conflict.

It must be remembered that we are not here dealing with the law of averages, but with the case of Paul McClure. The test imposed by section 4056 of the Labor Code is not entirely an objective one. The questions are, did Mr. McClure reasonably refuse the proffered treatment, and whether the commission's finding is based on expert medical and surgical evidence. There would seem to be little doubt but that the finding of reasonableness is amply supported.

Petitioner makes much of the fact that McClure also refused the rest in bed treatment suggested by Dr. Fender. That doctor had but little faith in that treatment, as evidenced by his testimony that in view of the fact the injury was almost two years old the possibility of a spontaneous cure was rapidly diminishing to the vanishing point. In view of the many treatments undergone by this patient his lack of confidence in this treatment was obviously justified.

Petitioner also contends that it was deprived of a fair trial because of the alleged bias and prejudice of the hearing referee. In this connection it cites *J. G. Boswell Co.* v. *Industrial Acc. Com.*, 67 Cal.App.2d 347 [154 P.2d 13]. In that case an award was annulled and a new hearing ordered because the appellate court found that the hearing referee, the same referee that heard the evidence in the present case, was biased and prejudiced. In that case, as the opinion discloses, the referee was biased and prejudiced. Each case must be determined on its own facts. The record in this case shows no such bias and prejudice. Petitioner objects because the referee asked the doctors certain questions after they had been examined by the lawyer for the employer. This was entirely proper under the circumstances. The employee was unrepresented by counsel. An examination of the questions asked shows that they were asked to bring out all of the facts, some of which had not been brought out by the attorney for the employer. The Boswell case recognizes that such procedure is permissible and proper.

Petitioner also contends that a memorandum filed by the hearing referee after the rehearing referee had recommended a rehearing shows bias and prejudice. In that memorandum the hearing referee stated the facts as he saw them. The summary is, on the whole, a fair one. He then concluded his memorandum as follows:

"Even at the risk of being charged by the eminent counsel for the defense with reflected prejudice and bias, I prefer to protect this applicant when I can do so without the risk of doing any injustice to the defendants.

"If the Commission, after a careful consideration of this memo and the entire record herein, believes that a rehearing should be granted and grants it, I will quit arguing the case —but until such time as a rehearing is granted in such case where the applicant has no attorney and is helpless and far away, I must write as I feel or write not at all. RECOMMENDA-

TION : Deny petition for rehearing.'' Assuming that this memorandum should be considered for the purpose of determining whether the referee was prejudiced, but keeping in mind that this referee had already passed on the facts, we are of the opinion that it does not demonstrate bias and prejudice. The memorandum reasonably can be interpreted as an honest and fair attempt to bring before the commission the true facts of the case as the hearing referee saw them. It must be remembered that in these cases it is the commission and not the referee that makes the orders. The commission had before it the rehearing referee's recommendation and that of the hearing referee. It was its responsibility to grant or deny the petition for rehearing. We must assume, of course, that official duty was properly performed.

The award is affirmed.

Knight, J., concurred.

WARD, J.—I dissent. In this case an examination of section 4056 of the Labor Code is imperative. It reads as follows: ''No compensation is payable in case of the death or disability of an employee when his death is caused, or when and so far as his disability is caused, continued, or aggravated, by an unreasonable refusal to submit to medical treatment, or to any surgical treatment, if the risk of the treatment is, in the opinion of the commission, based upon expert medical or surgical advice, inconsiderable in view of the seriousness of the injury.''

To accept the premise that the expert testimony required by the statute may be supplied by what one doctor, who subsequently changed his opinion, told the applicant for compensation, defeats the purpose of the statute. The language of the statute leads me to conclude that the finding of the commission must be based upon expert medical or surgical advice before the commission, rather than upon a statement to the applicant and repeated by the applicant to the commission, inasmuch as the qualifying phrase follows the word ''commission.''

Accepting the applicant's theory for the moment—that it was not unreasonable to refuse to submit to the operation—the record discloses that one physician, a Dr. Fender, who was the last to examine the applicant, recommended further

conservative treatment to relieve the applicant's difficulties because he felt that prior treatment had been complicated by incomplete rest. The treatment he proposed was simply to put the applicant in bed, flat on his back, for a period of two or three weeks. In answer to the question whether he would submit to such treatment by Dr. Fender, the applicant said he would not. In view of the seriousness of the injury—total disability—a flat refusal to submit to further conservative treatment cannot be said to be reasonable. In my opinion the award should be annulled.

Petitioner's application for a hearing by the Supreme Court was denied September 27, 1945.